## DIAMOND MATCH CO. v. RUBY MATCH CO.

(Circuit Court, D. New Jersey.   January 13, 1904.)

**1. PATENTS—CONSTRUCTION OF CLAIMS.**

Where a limitation expressly stated in some of the claims of a patent is omitted from others, it cannot be read into them to avoid a charge of infringement.

**2. SAME—PARTICULAR FORM OF MECHANICAL DEVICE.**

An inventor, in claiming a combination of certain elements, is not confined to the particular form of device of either of them described in the specifications, but is entitled to anything of the same general character which is a mechanical equivalent.

**3. SAME—INFRINGEMENT—IMPROVEMENT OF PATENTED DEVICE.**

Mere improvement of a patented device, even to the extent of novelty involving invention, does not necessarily protect from infringement.

**4. SAME—UNDESCRIBED MECHANISM FOR PRODUCING A CERTAIN MOVEMENT—MONOPOLY OF EVERY MEANS.**

Where an inventor does not confine himself to any particular form of device, such as is shown in the specifications and drawings, but claims generally "mechanism" (without describing it) suitable for giving a certain simple mechanical movement, it amounts to a monopoly of every means for doing so, which is not patentable.

**5. SAME—PATENTABILITY—COMBINATION.**

Where a device described in a claim of a patent as an element of a combination in a machine does not co-operate mechanically with the other parts, but acts separately—as a mechanism operated by a hand lever to lift another part out of position when the machine is stopped—the claim is for a mere aggregation, and not a patentable combination.

**6. SAME—INFRINGEMENT—MACHINE FOR MAKING MATCHES.**

The Beecher patent, No. 389,435, for a machine for making matches, while uniting elements which were old and taken from prior machines of different types, covers a new and novel combination, producing as a result a machine of larger capacity and higher efficiency than any previously known, and discloses invention, the controlling feature of the invention being mechanism for giving a combined step by step and continuous motion to the endless chain having perforated plates for carrying the match sticks through the different processes of manufacture and discharging the completed matches.   Claims 4 and 15 construed, and *held* infringed by a machine made in accordance with the Kelley patents, No. 592,605 and reissued patent No. 10,573.   Claim 17 *held* not valid or infringed.

In Equity.   Suit for infringement of letters patent No. 389,435, for a machine for making matches, granted to E. B. Beecher, September 11, 1888.   On final hearing.

Edwin J. Prindle, Charles J. Williamson, and Paul Bakewell, for complainant.

E. B. Stocking, for defendant.

ARCHBALD, District Judge.   This suit is based on letters patent issued to E. B. Beecher, September 11, 1888, for a machine for making matches, which the defendants are charged with infringing. Starting with the block from which the match splints are to be produced, the machine in one continuous operation, by means of its various devices and appliances, is able to complete and deliver, ready for

¶ 3. See Patents, vol. 38, Cent. Dig. § 379.

use, 6,000,000 matches, with the help of one man, within the compass of an ordinary working day. Extraordinary as is the result, the process is a reasonably simple one. The splints, as they are cut, are inserted by means of the cutter and cutter heads, row by row, into perforated plates, presented to receive them. These plates, loaded with splints, are carried by an endless chain, driven by appropriate machinery, to other parts of the apparatus, where the ends are dipped in a paraffine bath, and further on to a composition box where ignitable. heads are affixed. To allow the heads to harden, the plates are passed back and forth over numerous pulleys for a suitable interval, and are finally brought in a completed state back to the beginning, where they are ejected as they were inserted, row by row, by a corresponding row of punches, to make way for a new set of splints. At the point of insertion, as at the adjacent point of ejection, the endless carrier, with its perforated plates, must be held rigid, in accurate position to permit the inserting and ejecting of the splints, and must be advanced, step by step, until each plate is disposed of. On account of the great weight of the carrier as a whole—some 1,500 pounds—it cannot be stopped and started its entire length in this way without racking the machine; so that, in order to permit of this intermittent motion, a short portion, just before this point is reached, is hung slack between pulleys, while the progress of the rest is not disturbed. The carrier is thus given in part a step by step, and in part a continuous, motion, which, permitting, as it does, of the automatic process just described, may be regarded as the controlling feature of the invention. Closely associated with this is the use for the carrier of perforated metal plates attached together in endless chain, by which the capacity of the machine is immensely increased, and the damage from fire and its consequences—a serious matter in matchmaking—is greatly relieved. It is clear that there was nothing which had anticipated it in the prior art, as the following considerations will show:

As early as 1854, Gates and Harwood, of Utica, N. Y., secured a patent for an endless chain match machine, in which the carrier consisted of a continuous series of short wooden clamps or slats in pairs, each pair being pressed together by an intermediate bow-shaped metal spring, and having their contiguous faces lined with felt, in order to more effectively retain the match splints between them. These clamps, as they were fed over the cutters in pairs, were opened by a wedge, a row of match splints cut from the block by the cutters was carried up and inserted in them, the wedge was withdrawn, a hammer from above descended and evened the row, and the carrier moved on. Conveyed in this way, the splints were taken to other parts of the machine, where they were treated with friction heads, and after a sufficient interval brought back to the point of ejection, where a hammer, similar to that which evened the row, knocked the matches loose. The question is raised as to the character of the feed motion, whether intermittent or continuous, but it is clearly the latter. To make it otherwise, the gear or worm at the head of the shaft, z, must be an irregular or drunken worm, of which there is no indication, and without this it must be assumed to be of the ordinary and natural character. Moreover, the wedge which opens the clamp is said to have a

longitudinal motion, in order to move in the direction in which the clamp is going, which would be altogether unnecessary if its motion was arrested.   But what is conclusive on the subject, if there is any doubt about it, is that in the subsequent (1858) patent of Miller and Gates—Gates being one of the patentees in the Gates and Miller—the intermittent motion there shown is expressly claimed as an improvement, as it also is in the Newton (1858), its English counterpart, both provisional and final.   It is of no consequence, as against this, that in the Steber (1883) patent the motion of the Gates and Harwood is referred to as a step by step motion.   The reference is probably a mistake, the Miller and Gates being intended; but it is not material, as it cannot impose on the patent what is not there.   The Gates and Harwood must therefore be accepted as having continuous progression, without more.   This was the view originally taken of it by the plaintiffs' expert, which was nearer the mark than his subsequent retraction.   The attempt to make out of it, however, a combined step by step and a continuous motion cannot be sustained.   This is done by regarding the rear clamp as held or forced backward by the opening wedge while the forward clamp goes on; but this is altogether too refined and fanciful.   It is also charged of the Gates and Harwood that the specifications do not disclose an operative machine, and a criticism of several of its features upon that basis is indulged in. The subsequent machines, however, of which it was the forerunner, sufficiently refute the suggestion.   They form a type which has done valuable service in the art, and which with a capacity of a million matches daily has maintained its place by reason of its efficiency (notwithstanding others to be presently mentioned), until supplanted by the Beecher.

The Miller and Gates, and the Newton, its English representative, which immediately followed (1858), was merely an improvement on the Gates and Harwood.   It had, the same as the other, an endless carrier made up of wooden felt-lined clamps, the principal change, as already intimated, being from a continuous to an intermittent motion. This was followed at some distance by the three Stebers—two in 1883 and one in 1884—in which the same motion as the last, and the general features of both the preceding machines, were retained, which is all that needs to be noted of it.

In the meantime, however, a somewhat different type had been evolved by McClintock Young.   The endless slat carrier was abandoned, and a succession of perforated plates substituted, each of which, as filled, was removed and dipped by hand into a composition bath to affix the heads.   In its original form (1871) the perforated plates were of wood, and were adapted to be used as a permanent holder or back for the finished matches, if desired, or they could be ejected, and the plates used again.   But later (1877) the plates were made of metal, and furnished with handles, and for the more effective feeding of them into and through the machine they were provided with couplings to make a continued series.   When filled, however, they were detached again, and taken out singly or in sections, and the match splints dipped by hand into the composition head bath, as before; so that, while an endless series is spoken of in the patent, it is only in this sense, each

plate by means of the clamp and pin being successively coupled and uncoupled from the one preceding or following it. By reason of the increased length of the rows and the economizing of space between them by the use of perforated metal plates, this machine was capable of producing three and a half million matches a day, a large advance; but requiring, as it did, the attention of several operatives, and being subject to other disadvantages, it did not do away with the other type, which still continued to be used. In 1884 a novelty was devised by Faas by substituting, in place of the perforated plates, "dipping frames," so called, made up of rectangular transverse bars with beveled edges, held together by springs and opened by pawls to receive the splints.

This represents the art in matchmaking machines prior to the invention of Beecher, so far as we are concerned. In it, as will be seen, are two distinct types, each having merits of its own, and Beecher manifestly gleaned from both. Discarding the wooden slats of the earlier type, with their limited capacity, exposure to fire, and high percentage of loss of splints, he made up his carrier of a succession of perforated plates such as were used by Young, but handled them automatically and in endless chain, combining an intermittent and a continuous motion in the way described in order to accomplish it. However old the elements so made use of, he certainly was the first to bring them together as they here appear, supplying the necessary adaptation to make them operative, and producing as the result a machine of the largest capacity and highest efficiency so far known. For the patentable novelty thus devised he is entitled to the protection of the law, if it is found to have been infringed.

To sustain the charge of infringement, three claims of the patent in suit are relied upon, the fourth, fifteenth, and seventeenth, as follows:

"(4) In a machine for making matches, the combination of the following elements: A cutter head and cutter adapted to cut rows of match sticks and insert them into a corresponding row of perforations, an endless chain having plates with rows of perforations formed therein, a driver for moving the chain, and a corresponding row of punches for discharging the completed matches."

"(15) In a machine for making matches, the combination of an endless chain having a slack portion, plates with rows of perforations, a main driving mechanism for communicating to a portion of the chain an intermittent movement, and an auxiliary driving mechanism for communicating to a portion of the chain a continuous movement."

"(17) In a machine for making matches, the combination of the endless chain having the plate with rows of perforations, with the paraffine wheel, and mechanism for giving the wheel vertical movement, as and for the purpose described."

The last of these covers a distinct and separable feature not so far alluded to, and will therefore be considered later by itself. The other two fall under that which has been discussed. The defendants manufacture under patents to Alexander Kelley, one of July 5, 1898, and the other of July 31, 1900. The existence of these patents affords, of course, no protection if they invade the terms of the one in suit, even though they may improve upon it. Kelley for many years was a foreman in the plaintiffs' employ; and his machine in its general outlines

follows the Beecher, with which he had thus become familiar. Its endless carrier, however, is made up of separate metal bars, having grooves into and between which the match splints are inserted and carried; and the motion, as it is said, is continuous, and not intermittent, in which two respects it is sought to distinguish it. The four elements of the fourth claim, with which I will first compare it, are (1) a cutter head and cutter adapted to cut rows of match sticks and insert them into a corresponding row of perforations; (2) an endless chain, having plates with rows of perforations formed therein; (3) a driver for moving the chain; and (4) a corresponding row of punches for discharging the completed matches. The inventor is not confined to the specific form of these described in the patent (Smeeth v. Perkins [C. C. A.] 125 Fed. 285), but is entitled to anything of the same general character which is a mechanical equivalent. It is to be recognized that, to stand as such, the alleged infringing device must do the same work, by substantially the same means, operating in substantially the same way, and that the Beecher, not being a pioneer, is not entitled to any broad range. But as to two at least of the elements mentioned there can be no question. The suggestion that the cutter head must be adapted to forcibly insert the match splints into the carrier has nothing whatever to sustain it; except as something is read into the claim which is not there. When the inventor wished to impose this limitation, he did it in express terms, as several of the claims attest, and it is not to be implied, in consequence, in others. Paxton v. Brinton (C. C.) 107 Fed. 137; Boyer v. Keller Tool Co. (C. C. A.) 127 Fed. 130. Nor is this affected by anything to be found in the file wrapper. Accepting the suggestion that this claim was evolved out of claims 3 and 4 as originally presented, which were both rejected by reference to the English Newton, yet in its remodeled form it was allowed just as it stands. And, while it is true that counsel inadvertently proposed an amendment, this was declared by the examiner to be unnecessary, and was eventually withdrawn. Whatever might have been the case, therefore, had the amendment been persisted in, it is useless to try and impose a limitation derived from it, when it was not. The same observation is to be made with regard to the driver spoken of in this claim. One adapted to move the chain is all that is called for, whether continuously or intermittently, or a combination of both. When we come to consider the fifteenth claim it will be different, as it would be if others, such as the ninth, were involved. It is true that in taking this position we apparently abandon what is declared above to be the controlling feature of the invention—the combined step by step and the continuous motion—and it may be that in a machine of the strict character described by the inventor this motion would be forced upon us. But it is not required by anything found in the prior art, and the inventor would seem to be entitled, therefore, to maintain it broadly as it stands, provided the combination in which it appears is a novel one. It is not necessary, however, to definitely decide this question, for, as will be presently seen, the motion employed in the defendants' machine is a combined intermittent and continuous one, thus fulfilling the description given of that of the plaintiffs.

But the defendants, instead of an endless chain of plates with rows of perforations, have grooved bars, between which the match splints are inserted, and the question is as to their equivalency. This, I am convinced, is a change of form rather than of substance, each device performing the same function, in substantially the same way, with the same result. Taking any two bars or sections of bars, you have the equivalent of a plate with a row or rows (the plural does not change it) of perforations corresponding to the rows of match sticks cut from the block and adapted to receive and hold them. The bars are simply the plates divided up—a metamorphosis which is not sufficient to escape infringement. They are not loose, as it might seem from being separable, but are held rigidly together when in operative position by the pintles on either end engaged in the rivet eyes of the endless chain. It may be that in their divided form they are capable of additional and novel action, but mere improvement, even to the extent of novelty, involving invention, does not necessarily protect. McCormick v. Talcott, 20 How. 402, 15 L. Ed. 930; Railway Co. v. Sales, 97 U. S. 554, 24 L. Ed. 1053. The equivalency of the two devices is persuasively shown by reference to the Faas patent, from which Kelley is said to have got his idea, where the dipping frame, as it is called, composed of transverse bars, is made to take the place of the perforated plates devised by Young. It is said, however, that while the splints in the Beecher are held by their own elasticity, being forced into the perforations, in the Kelley they are held by an end or shoulder, projecting above the bars. But the fact is that, however placed, it is the elasticity of the splints and the retaining pressure of the metal which secures them in each case, the grooves in the one, like the perforations in the other, keeping them rigidly apart; nor is this changed by the later Kelley, in which only the alternate bars are grooved.

The remaining element is the discharge mechanism by which the completed match is removed from the carrier. In the Beecher it consists of a single row of punches, which corresponds with the rows of perforations in the plates, and by appropriate motion from behind, while the plates are held vertical, drives out the matches row by row, as each is brought into position opposite. In the Kelley the same thing is accomplished by so-called separators and a cleaner bar. As the bars of the carrier are disengaged from the endless chain at the point where removal is to be effected, the one in advance is forced forward by the descending wedge of the separators—or in the later Kelley by the auxiliary chain—and the matches are ejected by the cleaner bar, carried down between the separators. It is said that the matches drop as the carrier bars are opened, and that the sole function of the cleaner bar is to remove any that may chance to be left—a position which is advanced in the first Kelley, and has something, it must be confessed, to sustain it. But, on the other hand, it is expressly declared in the second Kelley that the cleaner bar descends into the space between the carrier bars as they are separated, "and forces the matches therefrom." This, as the last word on the subject, must be accepted as its intended function, and, being the same as that of the row of punches in the Beecher, the two are equivalent, the variation between them being one of form only. The fourth claim is therefore infringed.

So, also, in my judgment, is the fifteenth. Having established the mechanical identity of the grooved carrier bars of the Kelley with the perforated plates of the Beecher, the only question with respect to this claim is as to the slack portion of the endless chain, and the motion imparted by the driving mechanism, main and auxiliary. The slack appears in the Kelley from the point where the pintles of the carrier bars are disengaged from the endless chain to permit of the ejection of the matches to the point where new splints are inserted and the carrier re-engaged. This portion is, for the time being, segregated from the rest, and carried forward upon guides by means of an auxiliary chain, and at each of the two points mentioned it is left slack or loose between successively adjacent bars for the purpose indicated. Furthermore, as the point of insertion over the cutter heads is approached, a combined or reverse curve is given to the path of the carrier, down over one roller and under another, and then forward again. As each bar passes over the first roller it drops vertically out of the links of the chain engaging it, leaving a space or interval, a fraction of its diameter, into which a row of splints is inserted by the cutters, the tarrying bar being thereupon driven forward by a knocker, closing in upon and holding fast the splints, and at the same time being re-engaged by the endless chain. Here plainly is an intermittent movement, as distinct as in any of the machines in which such a movement is employed, and for exactly the same purpose. It may be that the rest is for but an instant, but it is no more than that anywhere, and it is sufficient to be effective. Combined, as it is, with the continuous motion given to the carrier throughout the remainder of its course, it appropriates the principle of the invention as well as invades the terms of the patent, and cannot be maintained. I have not failed to note in this connection that the claim under consideration calls for a main driving mechanism with an intermittent motion, and an auxiliary with one that is continuous, while in the defendants' machine these are apparently reversed. But what is to be considered "main" and what "auxiliary" is not altogether clear, and infringement is not avoided by a mere change of terms, nor would it be if the two were in fact distinct. The purpose to be accomplished by the intermittent movement, as contrasted with the continuous, is the same in both machines, and the mere shifting of it from the one mechanism to the other is not material.

The seventeenth claim remains to be considered. The distinctive feature here is the mechanism for giving the paraffine wheel vertical motion, in order to raise the match splints out of the bath. This is important when, for any reason, the machine is stopped, so that the splints will not absorb more of the preparation than they ought; and the arrangement contributes to the effectiveness of the machine by preventing imperfect matches from being turned out with the others, throwing discredit on the whole product. The means to accomplish this in the Beecher consists in a bar under the hand of the operator at the forward end of the machine, and a lever actuated by it, journaled on the shaft of the paraffine wheel, and having a cam surface at the lower end bearing on a stud pin. By drawing the bar forward, the lever is thrown and the wheel raised out of the bath by the cam, and, reversing the operation, it is depressed into it again. Numerous references

are cited against this construction, but there is no occasion to consider them. The whole apparatus is a most simple and ordinary mechanical contrivance, possessing no novelty and requiring no inventive skill to apply it. Given the problem, almost any mechanic could solve it. It may have required something more to perceive the desirability of raising the splints in case of a stop, looking to the highest effectiveness of the machine; but an idea is not patentable, and that is practically all that we have here. The inventor does not confine himself to the particular device shown in the specifications and drawings, which the defendants do not copy. What he claims is "mechanism" (that is to say of any and all kinds) suitable for giving the wheel vertical movement. As declared by Mr. Wiles, the plaintiffs' expert, who is quoted with approval by counsel, this "branch of the Beecher invention does not consist in providing any specific mechanism for raising or lowering the paraffine wheel, but involves a new feature of construction and operation in matchmaking machinery of the endless carrier type, viz., the raising of the paraffine wheel from its normal position for the purpose of suspending the operation of dipping the match sticks in the melted paraffine." A monopoly of every means such as is so claimed is not permitted by the law. O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601. To save the claim, therefore, the plaintiffs would have to limit themselves to some specific mechanical construction such as that described in the patent, and on that the defendants do not infringe.

But there is still another difficulty. The mechanism for raising the wheel is not made the subject of a distinct claim, but appears as one element of a combination of which the others are the endless chain, having a plate with rows of perforations, and the paraffine wheel. But there is no co-operation in what is thus brought together to produce a common result, and it is therefore a mere aggregation. 22 Am. & Eng. Enc. Law (2d Ed.) p. 294. No doubt they are all factors to make up a complete machine and turn out good matches, and in that remote sense may be said to work together. But mechanically they are distinct parts, acting separately, there being no more connection between the carrier and the mechanism for raising the paraffine wheel under which it passes than between that and the steam boiler or the standards of the supporting frame. To make the raising mechanism effective, a human factor, the hand of the operator, guided by his judgment, must intervene, and without this it has no influence on the product. Unless he sees occasion to act, the match produced will be equally good or equally bad, whether the wheel-raising mechanism is there or not. It is not as though it were automatic, raising the matches out of the bath on the stoppage of the carrier, and lowering that again on the resumption of its course. That might be regarded as directly cooperating with the other parts named to effect the general result. But, as it stands, I do not see that it does. Whether we look at the claim, therefore, from the one standpoint or the other, there is nothing on which the defendants can be held.

As the result of these conclusions, the fourteenth and fifteenth claims of the patent are sustained and held to be infringed, but as to the seventeenth claim the bill must be dismissed. Let a decree be

drawn to that effect, and referring the case to a master to take an account. The question of costs, which is raised, can be adjusted in that connection.