HAZELTINE CORPORATION v. SEARS, ROEBUCK & CO., Inc.

No. 150.

Circuit Court of Appeals, Second Circuit.

Aug. 16, 1935.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis, Willis H. Taylor, Jr., and R. Morton Adams, all of New York City, of counsel), for appellant.

Stephen H. Philbin and Clyde A. Norton, both of New York City, for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The three patents in suit relate in general to improvements in radio receiving sets. United States patent No. 1,648,808 was primarily directed to a "conductance ratio" arrangement in transformer cou-

pling, but in that aspect several of its claims were litigated, all were found invalid and were subsequently disclaimed. Hazeltine Corporation v. Radio Corporation of America (D. C.) 52 F.(2d) 504. Claim 19 is alleged to be a valid combination patent designed to make all the dials of a set with several tuned circuits read substantially alike. The defenses urged are invalidity, both because of lack of invention and because of the failure adequately to reveal the invention in the specifications, and noninfringement. The two other patents, United States patents No. 1,755,114 and No. 1,755,115, both relate to improvements in condensers; the former relating to an improved condenser per se, and the latter to the same condenser in conjunction with a tuned circuit. One is a divisional of the other; they were treated as one by the lower court, and will be so treated here. The alleged infringements are all due to the sale by the defendant of its "Silvertone" receiving set manufactured for it by the Colonial Radio Corporation, which is not a party to this suit.

United States Patent No. 1,648,808.

The only claim of this patent in issue is claim 19. It is not a claim for details of structure, but for a combination of elements individually old, thought to have sufficient merit to justify a patent. The three things which are embodied in the claim, and which the plaintiff says were the subject of Hazeltine's teaching, are an antenna coupling of a certain kind, similar tuned circuits, and a regenerative control. Judge Coleman, who tried the case in the District Court, 5 F. Supp. 674, held that the claim was invalid for lack of invention and also that it was not infringed.

The only element of the combination having any possible novelty is that relating to the antenna coupling. The part of the claim which relates to this specifics "means including a coil connected in the input circuit of the first vacuum tube in said amplifier for coupling said tube to an antenna system such that the tuning of the input circuit of said first vacuum tube is substantially unaffected by reasonable changes in the oscillation period of said antenna system."

The specification says (page 4, line 94) that:

"With a considerable step-up ratio, the capacity and resistance of the antenna are equivalent to much smaller capacity and resistance in the secondary circuit.

"The fairly close coupling between the primary coil and the secondary coil of $T_a$, $T_1$ and $T_2$ allows the primary and secondary circuits of each of these transformers to be tuned as a unit by the secondary condenser."

United States patent No. 1,173,079 to Alexanderson described a radio frequency system containing an antenna, a tuned circuit, a second tuned circuit, a second amplifier tuned stage, and a third tuned circuit, followed by a detector for producing audio-frequency currents. Each of the three tuned circuits had an inductance coil and a condenser (capacity); the condenser being variable so that each similar circuit could be tuned to select currents of the desired frequency and thus discriminate against other currents. The three tube stages amplified the currents. Alexanderson used an antenna transformer which was loosely coupled to its secondary tuned circuit and decreased the antenna effect in that way. Hazeltine, as appears from the quotation we have made from his specification (page 4, line 99), recommended the use of "fairly close coupling" which would increase the effect of changes in antennæ and compensated for it by the step-up ratio. Scott-Taggart, in his book on Therminic Vacuum Tubes, pp. 202–204, seems to have adopted the same plan as Alexanderson, for he said at page 201: "Fig. 164 shows a circuit having high selective properties, the intermediary circuits being tuned. A certain amount of interference is eliminated by the radio-frequency transformer $L_1L_2$, which is loosely coupled."

Likewise on page 202 he said: "The coupling on $L_1$ and $L_2$ and likewise on $L_3$ and $L_4$ should be tight, and should be loosened when tuning has been effected."

In the testimony of Carl R. Englund in Hazeltine Corporation v. Radio Corporation (D. C. Equity No. 43—351), 52 F.(2d) 504, relating to the American Telephone & Telegraph Company's instruments of the Alexanderson type used in receiving signals from Arlington, Va., in 1915, he said: "The transformers were used with couplings varying from very tight to very loose, that is, from the

coils pretty nearly within one another, and completely separated. * * * As the coupling in the transformers was decreased, the strength of the signals decreased. * * * As the coupling of the transformers decreased, the selectivity increased." Record, p. 1412.

He likewise said: "The coupling was used both loose and strong. The intensity of Arlington signals was quite great, and as I recall, we could receive with the coils entirely out in both transformers, probably not with the requisite volume, and I do recall that with the interference bad, as it was in the summertime, we very often had to reduce the coupling to the limit—to such limits that the signals were barely audible." Record, p. 1413.

We see from the above that loose coupling was well known for the purpose of reducing undesirable antenna effects. This was at some sacrifice of signal strength, but it is quite evident, both from the experiments of Scott-Taggart and from the reports as to the receivers used in the Arlington tests, that the coupling was loose or close as conditions required. It was familiar knowledge that a high step-up ratio in a transformer connecting two circuits would decrease the effect of the one upon the other. Indeed the whole theory and method of construction of transformers is incompatible with any other result. To compensate for antenna effects by means of a step-up ratio clearly required no invention. This is borne out by the statement of the appellant in its brief at page 19 that "those in the art had, at one time or another, (although with other ends in view) coupled an antenna to a radio set in almost every conceivable way and understood the theoretical principles involved sufficiently well to carry out the instructions once they were given." At page 20 of the brief appellant says: "In the antenna circuit where the parts could not be alike, couple the antenna so that it is tuned by the tuned circuit but so that variations in the antenna will not seriously disturb the tuning (and the art knew of various ways of doing this)." Likewise at page 3 of its brief appellant says: "The claims are not limited to details of structure, the specifications make it clear that the invention did not reside in such details and the history of the art shows that

although the elements of the combination were individually old, in various forms, no one had ever taught that the problems could be solved by selecting the right elements and combining them as Hazeltine did."

We may add that, if Hazeltine had thought his method of limiting the effects of the antenna circuit was in itself an invention, he and his experienced attorneys would have embodied it in a separate patent and would not have left it to the somewhat precarious fate of surviving only as an element in a combination claim.

The second element of claim 19 is "adjustably tuned means including a coil connected in the input circuit of each tube for coupling said tubes together, the electrical constants of all of the tuned circuits being substantially alike." This merely means that the Hazeltine tuned circuits had like electrical characteristics. Alexanderson's patent refers to his second tuned circuit as "a similar resonant circuit" (page 2, line 16) "tuned to be resonant to the same frequency as the first tuned circuit," and adds that "any number of circuits may thus be interlinked in accordance with the closeness of tuning desired." It certainly was not invention to make tuned circuits similar, and plaintiff's counsel was obviously right when the court remarked:

"Would not the easiest way of getting it (tuning in two circuits) be to have the transformers and condensers the same?

"Mr. Taylor: Obviously.

"The Court: That would be the normal thing. It would not require an inventor to suggest that that would do it.

"Mr. Taylor: I do not think so." Record, p. 499.

Accordingly we can see no invention in having tuned circuits of like electrical characteristics. Moreover, Scott-Taggart had pointed out that, "since all the circuits except the aerial circuit are independent of the aerial, they may be tuned together at the same time. The condensers $C_2$, $C_3$ and $C_4$ might all be made to rotate by simply turning one of them. The inductances $L_2$, $L_3$ and $L_4$ might also be varied together by turning one knob. By this arrangement tuning would be greatly simplified and there would really be only two circuits to tune,

the open one (antenna circuit) and the closed one (first tuned tube circuit)." Record, p. 1561.

The final element of the claim, after referring to undesirable capacity coupling between the input and output circuits of each tube of the amplifier whereby there is a tendency toward oscillation, provides "means for limiting said tendency so that detuning of any of said circuits for oscillation control is rendered unnecessary, whereby the adjustment for all of the tuned circuits is substantially the same at any given frequency setting within the range of the receiver."

This is the last element of Hazeltine's three teachings. This element made a part of the combination the "Plate Circuit Neutralization" which was the subject of prior Hazeltine patents, No. 1,450,080, No. 1,489,228, and No. 1,533,858, all of which are referred to in the patent under consideration and are, of course, a part of the prior art. While Alexanderson did not have neutralizing circuits, he had means for limiting the tendency to regenerative oscillations by varying the couplings and varying the voltages. This feature was dealt with by Judge Thacher in Radio Corporation v. E. J. Edmond & Co. (D. C.) 20 F.(2d) 929, 931, where it was one of the important subjects of consideration.

It is true that the result aimed at and in some measure, though not completely, achieved, was to make the dials of the various circuits read substantially alike, and that a control by a single dial, though not directly taught by the patent, was foreshadowed. So far as this was the case, it was the inevitable result of adding to the Alexanderson system two other elements already, as we have shown, well known to the art and obviously adapted to achieve the result. That the combination embodied in the claim was not in Hazeltine's mind when he filed his application seems evident from the fact that claim 19 was not made until two years later. This indicates that it was a matter which neither he nor his experienced attorneys had ever regarded as of importance. We agree with the court below that such a combination did not require invention. It amounted to no more than what is frequently called by the uninstructive term "aggregation." Accordingly claim 19 must fail for lack of invention. Such being the case, it is un-

necessary to decide the question of infringement.

### United States Patents No. 1,755,114 and No. 1,755,115.

These patents, based on a single original application, are directed to improvements in the construction and arrangement of tuning condensers. No. 1,755,114 relates to an adjustable condenser structure per se and No. 1,755,115 to such a structure in combination with an appropriate inductance to provide a tuned receiving circuit. It is the old rotatable type of tuning condenser having stationary plates and rotary ones interleaving therewith and separate means for making fixed capacity adjustments; one for adding a definite amount of capacity regardless of the position of the interleaving plates, and the other for fixing the rate at which the capacity of the condenser is decreased or increased as the interleaving plates are turned.

After remarking that the condenser plates should be rigidly and accurately plane and parallel, the patentee says in his specification that "there will still exist the probability of differences in the various tunable oscillatory circuits due to differences in the fixed capacities of the wiring and of the coils, etc.; and there may also be variations in the clearances of the plates of the different condensers that will cause their rates of change of capacity to differ slightly from one another."

The patentee goes on to say that he has provided means "to determine or vary first, the fixed or minimum value of the tuning capacity (or maximum resonant capacity), and second, the rate of change of capacity (or resonant frequency) with given displacement of the tuning control."

The means referred to are plate 10, for the minimum capacity adjustment, and plate 11, for the rate of change adjustment.

Claim 14 of patent No. 1,755,114, which is typical, is as follows:

"14. In a wave signalling system, the combination of an inductance coil, a tuning condenser having means for varying the capacity thereof, said coil and condenser being connected together to comprise a tuning circuit, and adjusting means for said condenser whereby the maximum resonant frequency of said circuit and

242

the rate of change of resonant frequency of said circuit may be adjusted independently of said means for varying the capacity of said condenser."

It was admitted at the trial that none of the elements of the foregoing claim was new.

Plate 10 is a nonrotating plate electrically connected with the rotors and placed near a stator so that it adds to the former capacity of the condenser. The amount of the added capacity depends upon the location of plate 10 with respect to its adjacent stator plate, and this is adjustable so that the amount of added capacity may be varied. Plate 11, which produces the rate of change adjustment, is an adjustable plate that is connected with the stators and increases the capacity as the rotor plates interleave with the stators. This makes possible an adjustment of the capacity of the condenser to which it is related, if the capacity of that condenser does not increase, as the plates are interleaved, as fast as another condenser which it is desired to have identical.

It is impossible without undue expense to construct condensers so that they will have identical capacities. Some adjustments are necessary, and these Hazeltine embodied in the foregoing patents. The trial judge properly held that the defendant's structure did not infringe. But we think the bill might also have been dismissed on the ground that the patents lacked invention. The use of a minimum capacity adjustment with a condenser was old, as shown by the trimmer condensers in United States patent No. 1,363,319 to Hogan and United States patent No. 1,618,017 to Lowenstein. The Lorenz German patent, No. 218,574 (1910), likewise shows a condenser provided with a series of trimmer condensers by which a desired minimum capacity can be obtained. Moreover, the condenser in United States patent No. 1,573,374 to Chamberlain shows plates numbered 50 and 51 which are built into the structure as in Hazeltine's patent and are employed for the same purpose as plate 10 thereof.

The prior art also contained adjustments of the rate of change. In United States patent No. 1,555,254 to Proctor is shown a rate of change adjustment by means of flexible cam plates electrically connected with the condensers and so arranged that, when the adjusting knob is turned, it does not itself directly turn the plates, but turns the cam and by means of the mechanism rotates the plates to such an angle as to give the desired or adjusted rate of change of capacity. In United States patent No. 1,702,833 to Lemmon is shown an auxiliary plate 11 providing a rate of change adjustment like the Hazeltine plate 11.

We cannot regard the combination of two elements having well-known tendencies to effect the adjustment desired as amounting to invention. But, if the particular structure described in these patents, because of its novelty and compactness, could be regarded as of sufficient merit to justify a patent, the adjustment employed by the defendant to determine the minimum capacity of the condenser was the well-known trimmer condenser widely used in the prior art and nothing like plate 10, and the adjustment of the rate of change employed was the bending of the condenser plates—an old expedient. This bending of the condenser plates was not only a method of adjustment familiar to those skilled in the art, but one permitting more delicate adjustment than the plane plate 11 of Hazeltine, which cannot provide a different rate of change at different degrees of rotation. That defendant can do by bending the plates more at one point than at another. In no event can plaintiff's claims be read broadly enough to cover the combination of two well-known forms of adjustment that have been found advantageous in constructing a series of radio condensers.

For the above reasons the bill of complaint should be dismissed in respect to United States patent No. 1,648,808 for lack of invention and in respect to United States patents No. 1,755,114 and No. 1,755,115 for lack of invention and for noninfringement.

Decree affirmed.